### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Roberto Sanchez and Lillian Sanchez, | **Case No.:** |
| Plaintiffs, | |
| v. | **COMPLAINT AND** |
| | **DEMAND FOR JURY TRIAL** |
| Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC, | 1. **FCRA, 15 U.S.C. § 1681** *et seq.* |
| Defendants. | |

Plaintiffs Roberto Sanchez and Lillian Sanchez, ("Plaintiffs") through counsel, allege violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendants Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and Trans Union LLC ("Trans Union") (referenced collectively as "Defendants").

## I.   <u>INTRODUCTION</u>

1.     Plaintiffs' Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* by the Defendants.  Plaintiffs contend Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' consumer reports, and consequently reported inaccurate information about Plaintiffs.  "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiffs from the consumer reporting

1

agencies and consumer reports obtained by third parties as a factor in establishing Plaintiffs' eligibility for credit.

## II.     JURISDICTION AND VENUE

2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3.     Venue in the District of Minnesota is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## III.     PARTIES

4.     Plaintiffs incorporate herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5.     Plaintiff Roberto Sanchez is a natural person who resides in Elk River, Minnesota.

6.     Plaintiff Lillian Sanchez is a natural person who resides in Elk River, Minnesota.

7.     Plaintiffs are "consumer[s]" as defined by the FCRA, 15 U.S.C. § 1681a(c).

8.     Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).   On information and belief, Experian is regularly engaged in the

business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

9.      Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of consumer reports, as defined in 15 U.S.C. § 1681a(d)), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

10.      Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f)). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served through its registered agent, Prentice Hall Corporation, located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

11.      During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Minnesota and conducted business in the State of Minnesota on a routine and systematic basis.

12. Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

13. During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

14. Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## IV.   FACTUAL BACKGROUND

15. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

16. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

17. Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

18.     The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

19.     Defendants, the three major consumer reporting agencies (at times referred to collectively as "CRAs" and individually as a "CRA"), in the United States, regularly publish and distribute credit information about Plaintiffs and other consumers through the sale of consumer reports.

20.     Defendants obtain consumer information from various sources. Some consumer information is sent directly to Defendants by furnishers, and other information is independently gathered by Defendants from third party providers, vendors or repositories, like computerized reporting services like PACER.

21.     Defendants regularly obtain consumer bankruptcy information to include in consumer reports.

22.     The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

23.     Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account,

credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

24.     The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendants' reports.

25.     The information Defendants include in consumer reports contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

26.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

27.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

28. Lenders also consider a consumer's debt-to-income ratio (DTI) based on the total amount of debt reported by Defendants in their consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

29. A consumer's income, however, is not included in their consumer report; only their amount of debt is.

30. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

31. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a

consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

32.    A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting as having a zero-dollar balance.

33.    Defendants are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

34.    Additionally, information indicating that a specific debt has not been discharged, but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendants independently obtain consumer bankruptcy case information.

35.    Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

36.    However, Defendants regularly report inaccurate information about consumers after they receive a Discharge Order.

37.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

38.     Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to Defendants, already included in Defendants' credit files, contained in public records that Defendants regularly access, and/or sourced through Defendants' independent and voluntary efforts.

39.     Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

40.     Defendants routinely report inaccurate, and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681(e)(b), despite possessing information inconsistent with the reported information that establishes the reported information is inaccurate.

41.     Defendants' unreasonable policies and procedures cause them to regularly report consumer information without verifying its accuracy.

42.     Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681(e)(b).

43.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendants' own files.

9

44.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

45.     Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, which cause Defendants to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

*Allegations Specific to the Credit Reporting of Plaintiffs*

46.     Plaintiffs filed a "no asset" Chapter 7 Bankruptcy on or about September 18, 2019, in the United States Bankruptcy Court for the District of Minnesota (Case No. 19-42826).

47.     Plaintiffs received an Order of Discharge on or about January 7, 2020.

48.     Thereafter, Plaintiffs were not personally liable for their dischargeable debts. All dischargeable debts carried zero-dollar balances after the bankruptcy discharge.

49.     Defendants prepared one or more consumer reports concerning Plaintiffs after Plaintiffs were discharged from Chapter 7 Bankruptcy.

50.     In Plaintiffs' consumer reports, Defendants included the bankruptcy case number, court, filing date and the fact that Plaintiffs' bankruptcy had been discharged in the Public Records sections of Plaintiffs' consumer reports.

51.     Defendants also reported Plaintiffs' credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for

the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

52.     Defendants obtained notice of Plaintiffs' bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by Defendants in Plaintiffs' consumer reports.

53.     Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

54.     Defendants should have reported **all** of Plaintiffs' dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance but did not.

55.     All three Defendants inaccurately reported Plaintiff Lillian Sanchez's First Progress Card Account ("Lillian's Account"), 544303000212**** and opened in January 2017, which predated Plaintiffs' bankruptcy filing.

56.     All three Defendants also inaccurately reported Plaintiff Roberto Sanchez's First Progress Card Account ("Roberto's Account"), 544303000212**** and opened in January 2017, which predated Plaintiffs' bankruptcy filing (Lillian's Account and Roberto's Account are hereinafter referred to collectively as the "Accounts").

11

57.    The Accounts were included in Plaintiffs' bankruptcy and discharged on or about January 7, 2020.  Therefore, the Accounts should have been reported as discharged in bankruptcy, and/or with zero-dollar balances.

58.    However, all three Defendants inaccurately reported Lillian's Account as charged off with past due amounts owed.

59.    Defendants did not indicate that Lillian's Account was discharged in bankruptcy or report Lillian's Account with a zero-dollar balance, despite reporting Plaintiffs' bankruptcy in the public records section of Lillian's consumer report and reporting other pre-bankruptcy accounts as discharged or included in bankruptcy and/or with zero-dollar balances.

60.    Defendants also inaccurately reported Roberto's Account as charged off with past due amounts owed.

61.    Defendants did not indicate that Roberto's Account was discharged in bankruptcy or report Roberto's Account with a zero-dollar balance, despite reporting Plaintiffs' bankruptcy in the public records section of Roberto's consumer report and reporting other pre-bankruptcy accounts as discharged or included in bankruptcy and/or with zero-dollar balances.

62.    The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially whereas here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline

12

indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

63.     The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

64.     According to Experian, creditors typically charge off accounts after they have been delinquent, *i.e.*, gone without any scheduled payments for six months, a charge-off does not mean your debt is forgiven, you are still legally responsible for repaying the outstanding amount.

65.     According to Equifax, a charge-off means the lender has written the account off as a loss and the account is closed to future charges, the time frame is generally between 120 and 180 days after you become delinquent, and a charge-off does not mean that you no longer owe the debt, you are still legally obligated to pay the debt.

66.     First Progress furnished information to Defendants that indicated Plaintiffs' debts were included or discharged in bankruptcy, and/or had zero-dollar balances after the bankruptcy discharge, but Defendants rejected or otherwise overrode the data they received.

67.     Alternatively, Defendants knew from past experiences that First Progress furnished inaccurate information regarding discharged debts or, has historically failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

68.     Nevertheless, Defendants blindly relied on the information provided by First Progress even though this information conflicted with or was contradicted by information contained in Defendants' records, as well as Defendants' knowledge regarding Plaintiffs' bankruptcy and discharge.

69.     Defendants' reliance on the furnisher, First Progress, was therefore unreasonable.

70.     Defendants inaccurately reported that both Roberto and Lillian owed balances that they did not actually owe, and also reported inaccurate account statuses and/or payment histories.

71.     Defendants inaccurately reported the Accounts as charged off after the Accounts were discharged in Chapter 7 Bankruptcy and therefore had zero-dollar balances.

72.     Defendants failed to indicate that the Accounts had zero-dollar balances and/or were included/discharged in Chapter 7 Bankruptcy, and instead inaccurately reported this as charged off.

73.     Defendants' reporting of the Accounts is patently false/incorrect and therefore inaccurate.

74.     If not patently false/incorrect, Defendants' reporting of the Account is materially misleading and therefore inaccurate.

///

*Plaintiffs' Damages*

75.     After Plaintiffs' bankruptcy discharge, Plaintiffs both applied for credit card accounts from Capital One but were denied due to the inaccurate reporting of the Accounts by Defendants.

76.     Defendant Equifax's inaccurate reporting of Lillian's Account, along with additional information belonging to Lillian, was published to Capital One, TD Bank, Wells Fargo Dealer Services, Ford Motor Credit, First Investigators Servicing, MDG USA, Inc., Bristol West Insurance Company, Comenity Bank, Farmers Insurance Group, Fortiva, 7th Avenue, The Bank of Missouri, and Aspire by Equifax.

77.     Defendant Experian's inaccurate reporting of Lillian's Account, along with additional information belonging to Lillian, was published to Westlake Financial, Synchrony Bank, Consumer Portfolio Services, Capital One, Old Navy, Capital One Auto Finance, Ford Credit, Diamond Loyalty Financing, Discover Financial Services, The Bank of Missouri, Bank of America, Finwise Bank, Onemain, Google North America, Inc., First Advantage, and Clarity Services, Inc. by Experian.

78.     Defendant Trans Union's inaccurate reporting of Lillian's Account, along with additional information belonging to Lillian, was published to Synchrony Bank, Consumer Portfolio Services, Nationwide, Royal Credit Union, Capital One, Old Navy, Ford Credit, Prestige Financial, Regional Acceptance Corporations, Mission Lane Tab Bank, The Bank of Missouri, Celtic Bank, University Auto Sale, Tidewater Motor Credit,

Avant, Upstart Network, Inc., Applied Data Finance, BlueAlliance, T-Mobile, Monevo, Inc., Quinstreet, Continental Financial Company, and Allstate by Trans Union.

79. Defendant Equifax's inaccurate reporting of Roberto's Account, along with additional information belonging to Roberto, was published to Capital One, Wells Fargo Dealer Services, First Investors Financial Services, Ford Motor Credit, Swiss Colony, inc., Comenity Bank, The Bank of Missouri, and MDG USA, Inc. by Equifax.

80. Defendant Experian's inaccurate reporting of Roberto's Account, along with additional information belonging to Roberto, was published to Westlake Financial, Consumer Portfolio Services, Capital One, Ford Credit, Diamond Loyalty Financing, Bank of America, Synchrony Bank, Comenity Bank, Affirm, Inc., Alliance Data, Progressive Insurance, Finwise Bank, and Lendingpoint, LLC by Experian.

81. Defendant Trans Union's inaccurate reporting of Roberto's Account, along with additional information belonging to Roberto, was published to Consumer Portfolio Services, Nationwide, Star Auto and Truck, Royal Credit Union, Capital One, Barclays Bank Delaware, U.S. Bank, Ford Credit, Prestige Financial, Regional Acceptance Corporation, Celtic Bank, The Bank of Missouri, Synchrony Bank, Geico, Continental Financial, Quinstreet, Duvera, Allstate, Homesite Group, and The Vision Companies by Trans Union.

82. As a direct result of Defendants' inaccurate reporting, Plaintiffs suffer damages, including harm to their reputation, image, and standing, a decreased credit score, lower overall creditworthiness, and other financial harm.

83.     Additionally, Plaintiffs suffer interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiffs' right to privacy, and anxiety.

## V.    COUNT I
### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

84.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

85.     The FCRA requires CRAs, like Defendants, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

86.     Defendants negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiffs' credit information pertaining to pre-bankruptcy debts after a consumer Plaintiffs received a Discharge Order.

87.     Defendants independently sought information about Plaintiffs' bankruptcy filing and discharge and voluntarily reported the same in Plaintiffs' consumer reports.

88.     When Defendants procured and published Plaintiffs' bankruptcy information, they had an obligation to ensure they followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

89.     Defendants knew or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable

17

debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendants knew or should have known of their obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

90.     These obligations are well established by the plain language of the FCRA, in promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendants from which Defendants are on notice of their unreasonable procedures concerning the reporting of discharged debts.

91.     Additionally, Defendants possess or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

92.     Despite knowledge of these legal obligations, Defendants willfully and consciously breached their known duties and deprived Plaintiffs of Plaintiffs' rights under the FCRA.

93.     In this case, Defendants inaccurately reported accounts that Defendants knew predated Plaintiffs' Chapter 7 Bankruptcy and were included and discharged by Plaintiffs' bankruptcy discharge.

94.     Defendants had actual knowledge of Plaintiffs' bankruptcy and Discharge Order, as evidenced by the information they published in Plaintiffs' consumer reports, including Plaintiffs' bankruptcy case number, court, date of filing and date of discharge.

95.     Defendants are also on notice from other tradelines reported by Defendants that indicate Plaintiffs' accounts were included in and discharged in bankruptcy.

96.     Defendants received notice of Plaintiffs' bankruptcy discharge through public records, their own files, and information provided by data furnishers.

97.     Defendants know that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

98.     Yet in this case, Defendants reported the Accounts, which predated Plaintiffs' bankruptcy, as charged off without any indication the Accounts were discharged or had zero balances.

99.     Defendants violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiffs' credit file/report.

100.    Defendants also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendants knew or should have known the information Defendants are reporting is inaccurate, and/or otherwise contradicted by information known by Defendants, reported to Defendants, and/or reasonably available to Defendants.

101.    Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

102.    Alternatively, Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

103.    Defendants' inaccurate reporting damaged Plaintiffs' creditworthiness.

19

104.   Plaintiffs suffer actual damages, including harm to their reputation, standing, and image, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

105.   Plaintiffs also suffer interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, loss of sleep, frustration, shock, embarrassment, and anxiety.

106.   Defendants are direct and proximate causes of Plaintiffs' damages.

107.   Defendants are substantial factors in Plaintiffs' damages.

108.   Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court enter judgment against Defendants for the following:

(a)   Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b);

(b)   An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)     An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and

1681o(a)(1);

(d)     An award of punitive damages, as allowed by the Court pursuant to 15

U.S.C. § 1681n(a)(2),

(e)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3)

and § 1681o(a)(2); and

(f)     Such other and further relief as this Honorable Court may deem just and

proper, including any applicable pre-judgment and post-judgment interest,

and/or declaratory relief.

## VII.   JURY DEMAND

Plaintiffs hereby demand jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 16th day of November 2021,

By: */s/Jenna Dakroub*
Jenna Dakroub
Bar Number: 0401650
Attorneys for Plaintiffs,
Roberto Sanchez and Lillian Sanchez
Price Law Group, APC
8245 N. 85th Way
Scottsdale, AZ 85258
Telephone: (818) 600-5513
Fax: (818) 600-5413
E: jenna@pricelawgroup.com